GLASPELL ET AL. *v.* OHIO EDISON COMPANY ET AL., APPELLANTS; MAHONING VALLEY CABLEVISION, INC., APPELLEE.

[Cite as Glaspell *v.* Ohio Edison Co. (1987), 29 Ohio St. 3d 44.]

(No. 86-567—Decided March 25, 1987.)

*Harrington, Huxley & Smith* and *John C. Litty, Jr.,* for appellant Ohio Edison Company.

*Haynes & Sontich* and *Joseph P. Sontich,* for appellant United Telephone Company.

*Pfau, Pfau & Pfau* and *William E. Pfau, Jr.,* for appellee.

HOLMES, J.  The precise issues for determination are whether the indemnity agreement before the court is violative of public policy and, if not, whether its terms encompass the injury complained of. For the reasons expressed within, we find that the agreement is enforceable among the parties.

United Telephone granted Cablevision a license which, among other acts, permitted appellee to install equipment upon and make use of appellants' utility poles for the purpose of transmitting cable television signals to Cablevision's subscribers. The agreement also provided, in pertinent part:

"8. *Indemnity to the Licensor*

"(a) The Licensee [Cablevision] covenants and agrees to indemnify and save harmless the Licensor, its agents, officials, servants or workmen, and the Ohio Edison Company, its agents, officials, servants or workmen from and against any loss, cost, charges, damages and expenses which the Licensor or Ohio Edison Company may at any time or times hereafter bear, sustain, suffer, be at or be put unto for, or by reason of, or on account of (i) the installation, maintenance or use of the said equipment on or in the Licensor's or Ohio Edison Company's facilities, * * *; and the Licensee shall, upon demand and at its own sole risk and expense, defend any and all suits, actions or other legal proceedings which may be brought or instituted by third persons against the Licensor or Ohio Edison Company or their successors or assigns, on any such claim, demand or cause of action; and will pay and satisfy any judgment or decree which may be rendered against the Licensor or Ohio Edison Company, their respective successors or assigns, in any such suit, action or other legal proceedings; and will reimburse the Licensor or Ohio Edison for any and all legal expense, including court costs, incurred in connection therewith."

Agreements purporting to indemnify have received varied treatment by the law. Earlier common law disfavored the shifting of liability among potentially negligent parties. See, *e.g., Merryweather* v. *Nixan* (K.B. 1799), 8 T.R. 186, 101 Eng. Rep. 1337. In particular kinds of circumstances, Ohio has forbidden enforcement of indemnity agreements. See, *e.g.,* R.C. 2305.31 and *Kendall* v. *U.S. Dismantling Co.* (1985), 20 Ohio St. 3d 61, 20 OBR 360, 485 N.E. 2d 1047 (construction contracts); R.C. 4123.82 and *Ledex, Inc.* v. *Heatbath Corp.* (1984), 10 Ohio St. 3d 126, 10 OBR 449, 461 N.E. 2d 1299 (employment contracts). However, absent specified public policy exceptions, the law of Ohio generally allows enforcement of indemnity agreements. See, *e.g., Allen* v. *Standard Oil Co.* (1982), 2 Ohio St. 3d 122, 2 OBR 671, 443 N.E. 2d 497; 18 Ohio Jurisprudence 3d (1980) 389, Section 38.

Where it is alleged that the agreement protects an indemnitee from

the financial consequences of his own negligence, the greater weight of authority, particularly in Ohio, would construe the words of such an agreement most narrowly. *George H. Dingledy Lumber Co.* v. *Erie RR. Co.* (1921), 102 Ohio St. 236, 131 N.E. 723; *Kay* v. *Pennsylvania RR. Co.* (1952), 156 Ohio St. 503, 46 O.O. 417, 103 N.E. 2d 751; Ohio Jurisprudence 3d, *supra,* at 393, Section 41; 15 Williston on Contracts (1972) 141, Section 1750; 6A Corbin on Contracts (1950) 602, Section 1472; see 2 Restatement of the Law, Contracts (1932) 1079-1081, Sections 574 and 575.

The requirement that this court strictly construe this particular category of indemnity agreement would be unreasonable, in that the rule was developed to guard against a specific practice. Often one party to a contract, being in a position to impose terms upon the other with no realistic opportunity to bargain afforded, would include those standardized clauses in the contract as would unreasonably impose upon the non-bargaining party burdens which were wholly inequitable. With such contracts of adhesion in hand, the drafting party invariably asserted, "the indemnity or the exculpation, so that the policies supporting the rule of 'contra proferentem' [against the proffering party], * * * caused the courts to apply the rule." Corbin on Contracts (1984 Supp., Part 2) 624, Section 1472(E). Thus, while clauses limiting the liability of the drafter are ordinarily to be strictly construed, we need not do so when such burden of indemnification was assented to in a context of free and understanding negotiation. See, *e.g.,* Williston on Contracts, *supra,* at 141, Section 1750.

The parties in the case before us are commercial enterprises of sufficient size and quality as to presumably possess a high degree of sophistication in matters of contract. They all provide services to the general public as their means of producing income and customarily rely on contracts. Each has the financial power to provide against loss by insurance or other means.

Appellants' possession of property for which appellee sought rights of access and use merely describes the ordinary circumstances which give rise to a freely negotiated agreement. That a company bargains from a position of need and would consider it inadvisable to engage in a particular enterprise unless access to specific resources were available cannot be construed as a coercion which offends public policy, especially where, as here, the indemnity clause agreed upon was a most reasonable allocation of the risks of doing business among fellow businesses. Consequently, there is apparently no applicable rule which would require a narrow interpretation of the clause *sub judice.*

Having determined the inadvisability of narrowly construing the agreement before us, it should be pointed out that even a strict construction would require that all the words used be taken in their ordinary and popular sense. Ohio Jurisprudence 3d, *supra,* at 395, Section 42. There is also authority for the proposition that the word "negligence" need not be utilized where an intention to exclude liability predicated upon such is set

forth by words excluding liability "for any and all harms however caused." Corbin on Contracts, *supra,* at 604, Section 1472; Restatement of Contracts, *supra,* at 1079-1081, Sections 574 and 575. Notwithstanding such latitude, the agreement before us is resolvable by its own terms, which are clear and precise in their allocation of the risk of doing business. See *Standard Oil Co., supra,* at 124, 2 OBR at 672, 443 N.E. 2d at 499, quoting *Lawler* v. *Burt* (1857), 7 Ohio St. 340, 350.

Even a cursory review of the clause at issue demonstrates that it is not an attempt to exculpate appellants for their actions under all circumstances. Rather, the thrust of the agreement is to allocate the burden of additional risk, which risk of harm comes into existence solely as a result of the grant to appellee of rights to access and use appellants' property.

The text of the full Joint Use Agreement, which was available to the courts below, demonstrates that the parties intended to allow appellee access rights for various purposes, including installation of equipment or facilities upon the utility poles. The phrase at issue provides indemnification of appellants for "any loss * * * which * * * [appellants] may at any time or times hereafter bear, sustain, suffer, be at or be put unto for, or by reason of, or on account of (i) the installation, maintenance or use of the *said equipment* on or in * * * [appellants'] facilities.*" (Emphasis added.) The "said equipment," far from being an ambiguous term, refers to the equipment to be installed by appellee, since it is the only equipment comprehended by the agreement which is to be installed "on or in" appellants' facilities. Furthermore, the same language is used with a similar intent in provision 2(g) of the agreement, which allocates liability for damage to United Telephone's facilities. It is stated there that: "In the event that the facilities or equipment of * * * [United Telephone] is in any way damaged * * * *by reason of, or on account of, the installation, maintenance,* or removal *of * * * [appellee's] facilities or equipment in or on * * * [United Telephone's] facilities * * *"* (emphasis added), then the burdens of notice and liability are upon the appellee.

What was intended by the parties, as evidenced by the words utilized in the agreement at issue, was that in exchange for rights of access to appellants' facilities, appellee was obligated to bear all risk of additional harm which might occur in connection with appellee's right of access. The issues of what kind or degree of harm are determined by the word "any." The only question which this clause allows, consistent with public policy, is whether the loss and consequent legal action derive from appellee's right to install, maintain or use its equipment "on or in" appellants' facilities. In the case *sub judice* harm occurred during such activities. Since the subject of liability was anticipated in the indemnity agreement, such indemnification must be provided to appellants. *Kay, supra; Standard Oil Co., supra.*

Accordingly, we reverse the judgment of the court of appeals.

*Judgment reversed.*

MOYER, C.J., SWEENEY, LOCHER, WRIGHT and H. BROWN, JJ., concur.

DOUGLAS, J., dissents.

DOUGLAS, J., dissenting. Since I cannot agree with the analysis of the majority, I respectfully dissent.

I believe today's opinion will cause unnecessary confusion regarding the continued viability of *George H. Dingledy Lumber Co.* v. *Erie RR. Co.* (1921), 102 Ohio St. 236, 131 N.E. 723, and *Kay* v. *Pennsylvania RR. Co.* (1952), 156 Ohio St. 503, 46 O.O. 417, 103 N.E. 2d 751. The majority's analysis contradicts the holdings of those landmark decisions, and yet leaves it to the reader to guess whether they remain good law. *Dingledy* and *Kay* are contradicted by discarding the requirement for strict construction of agreements limiting the liability of the drafter in situations where the parties thereto are business entities. Yet both *Dingledy* and *Kay* involved agreements where both parties thereto were sophisticated commercial enterprises and both decisions still required strict construction. The new rule created today for business entities flatly refutes that requirement. If the majority wishes to overrule, or at least modify, *Dingledy* and *Kay,* it should expressly so state for the guidance of the bench and bar.

I have a second, more serious, objection to today's decision. After much reflection on the matter, I have become convinced that a party should not be permitted to deflect liability for his own negligence onto another, even where the bargaining power of both parties is equal and the context is one of free and understanding negotiation. This kind of practice has too great a potential for limiting and even foreclosing the options of an innocent injured third party. For example, if the indemnifying party has gone bankrupt, the injured party would have no meaningful remedy against such indemnitor and at the same time would be barred from pursuing the party actually responsible. A similar situation would exist where a person is injured on the job by defectively designed machinery, and the manufacturer has deflected liability, by agreement, onto the injured party's employer. In such a case, the injured party would again be without a remedy, since the employer is immune from suit under the Ohio Workers' Compensation Act.

Accordingly, since it is my belief that at the very least we should require strict construction of such agreements as recognized in the previous Ohio case law, I dissent.